250 S.W.2d 1008 (1952)
FRAZIER et al.
v.
NATIONAL BEARING DIVISION, AMERICAN BRAKE SHOE CO.
No. 42716.
Supreme Court of Missouri, Division No. 1.
July 14, 1952.
Rehearing Denied September 8, 1952.
Ellis Outlaw, St. Louis, for appellants.
G. W. Marsalek, Moser, Marsalek, Carpenter, Cleary & Carter, St. Louis, for respondent.
HOLLINGSWORTH, Judge.
This is a workmen's compensation case. Claimants-appellants are the dependent widow and minor child of Henry Frazier, deceased employee of respondent National Bearing Division, American Brake Shoe Company. Following the employee's death on December 2, 1949, they filed this claim under the Workmen's Compensation Law, Section 287.010 et seq., RSMo 1949, V.A.M.S., alleging that employee's death was caused by an occupational disease, lead poisoning, arising out of and in the course of his employment. The referee found in their favor and fixed the amount of their award at $9,510.
Upon review, the Industrial Commission, by unanimous decision, reversed the referee, specifically finding "that claimants failed to prove that the condition causing *1009 the death of the employee was either caused or aggravated by an occupational disease arising out of and in the course of his employment * * *." Upon appeal to the circuit court, the decision of the commission was affirmed and claimants have appealed from that judgment. The amount involved being in excess of $7,500, jurisdiction of the appeal lies in this court.
Appellant's contentions are that the award of no compensation is contrary to the overwhelming weight of the evidence; is not based upon facts but upon guesswork of respondent's witnesses, none of whom had ever seen the employee; that the Act is to be construed liberally and favorably to the employee; and that the commission (and the trial court) failed to give due deference to the referee's finding.
At the time of his death on December 2, 1949, the employee was forty-five years of age. He had been continuously in the employ of respondent since 1926, except for a period of service in the armed forces. According to respondent's records, his duties were those of a metal sorter, receiving purchases of metals and sorting and storing them in bins. He had nothing to do with smelting or pouring molten metal.
He was married to claimant Earlear Frazier on May 2, 1948. Mrs. Frazier testified that he entered the Veterans Hospital in March, 1949; and that from the time of their marriage and especially after he went to the hospital he suffered from abdominal and leg cramps, had no appetite, was constipated, had a powderish complexion and sneezed from the dust, which, he said, came from metal. He could not sleep well, had a bad taste in his mouth and declining eyesight. His last illness began on November 20, 1949. He suffered cramps in his legs, hands and stomach, could not eat and his urine got very bad. The doctor was called on November 25th.
Dr. John F. Benson, a graduate of Meharry Medical College, and who had been engaged in general practice since his graduation in 1944, attended employee during his last illness. He first saw employee on the morning of November 25th. Employee was suffering from headaches, abdominal and leg cramps, loss of appetite and constipation and appeared to be anemic. He saw employee again that evening, at which time employee was semi-comatosed, in convulsion and claimed he had lost his eyesight. At Dr. Benson's direction, employee was hospitalized at St. Mary's Infirmary. On the early morning of the 26th, employee was comatosed, did not respond to tactile or oral stimulation, and exhibited Kussmaul breathing, which means that the breathing gradually slows down and then builds up again. He had pallor and a terrific uremic odor on his breath. His gums were dark blue and there was a line at the border of the gums and the teeth.
As Dr. Benson was leaving employee's home on the first day he saw him, the idea "struck" him as to the type of employee's work. He returned to employee's bedside and learned from him that he worked with metals. Employee told him he was a smelter, and he thereupon made a diagnosis of probable lead poisoning.
After employee was hospitalized, Dr. Benson called Dr. E. B. Williams, an internist, into consultation. Dr. Williams did not testify, but Dr. Benson testified that they there agreed upon a diagnosis of "uremia, hypertensive cardiorenal and encephalopathy", the latter term meaning comatosed.
On the day employee was taken to St. Mary's, November 25th, a blood smear, taken and examined at Dr. Benson's direction, showed 2% to 3% stippling of the blood cells. Five days thereafter, at Dr. Benson's request, a blood lead level test was made at the City Laboratory. It showed the lead content of employee's blood to be within normal limits. Dr. Benson's explanation of the result of this blood lead level test was that he had been treating employee for uremia during the five days prior to the test and the treatment changed the patient from an acidotic state into an alkalosis, in which latter state the lead formerly in the blood would no longer be in the peripheral blood but would be stored in the bones, immunized as an insoluble lead phosphate.
Dr. Benson's prior experience in lead poisoning cases was limited to the treatment of four children who had contracted lead *1010 poisoning from inhalation of fumes from burned storage batteries. He admitted that stippling of blood cells can occur in conditions other than lead intoxication, but he considered stippling a very important factor where the patient is exposed to lead. He had employee's March 1949, record in the Veterans Hospital. It shows that a blood count was there made in which no stippled cells were found and there is no indication of lead poisoning. Basing his diagnosis upon employee's history (including employee's statement that he was a smelter) and upon the finding of stippling in the blood cells, Dr. Benson's conclusion was that lead poisoning (chronic plumbism) was a contributing cause of employee's death.
The testimony in behalf of respondent was given by three witnesses:
(1) Florence McGinnis, a registered nurse employed by respondent for more than three years;
(2) Herbert Weber, chief industrial hygienist for American Brake Shoe Company for the past six years, holding degrees of Master, Bachelor and Civil Engineer; in charge of industrial hygiene for fifty-six plants of American Brake Shoe Company; a writer of numerous articles and one of a committee of six appointed by American Standards Association to fix working and safe hygienic conditions in industrial plants; and,
(3) Dr. Charles W. Miller, a 1912 graduate in medicine from St. Louis University, and who had done post graduate work in Washington University, Rush Medical College and the University of Vienna, a member of several medical societies, and who had seven years of experience with a lead company in matters of this nature.
Mrs. McGinnis knew Henry Frazier as an employee of respondent and presented his medical record card. It showed a slight accident suffered by employee in 1945 and no other reported illness, and that employee at intervals had left specimens of urine for analysis.
Herbert Weber testified:
He was in charge of assaying the environment and control of hazards to employees and to make recommendations for correction of any hazards found. One of the methods used is collecting and analyzing samples of dust or foreign matter in the air in respondent's plants. Such surveys were made in the St. Louis plant.
The first air analysis was made in 1941. Three samples were taken from the vicinity in which employee worked. The results are expressed in concentration of lead, the number of milligrams per 10 cubic meters of air. The first was 4.7; the second, 1.2; and the third, 1.5; an overall average of 2.4 milligrams per 10 cubic meters of air.
The next samplings were taken in 1947. The results of two were 0.5 and 0.9; an average of 0.7 milligrams per 10 cubic meters of air. A sampling taken near a grinder at the same time showed 5.5 milligrams. But employee worked ten or fifteen feet from that point and it would not directly affect him.
In May, 1949, the samplings showed 0.7, 0.7 and 0.9; an average of 0.7 milligrams per ten cubic meters of air.
Over the period of years the average was 1.8 milligrams. The hygienic standard is 1.5. But these figures refer to elemental lead. The exposure to which employee was subjected was lead oxide. The standard of 1.5 milligrams is too low for lead oxide, and is now being revised upward by the American Standard Association. Five years experience shows that 3.0 milligrams per ten cubic meters of air is a safe level for lead oxide. Eliminating the one sample taken near the grinder, the overall average to which employee was exposed during the years was 1.4 milligrams of lead oxide.
A check on the lead intake and output of employees is also taken. This is done by spot urine tests sent to Chicago for analysis. They are taken by plant nurses. Thirteen of these tests were made of employee's urine between the dates of August 3, 1942, and January 21, 1949. The United States Health Service shows the normal urine specimen to vary from zero to 200 micrograms per liter. All of the specimens were within that range and showed no abnormal or high excretion rate. Lead is found in the urine of everyone. When it is found in abnormal quantities in the urine of any employee, *1011 he is sent to a doctor for physical examination and treatment.
Dr. Charles W. Miller testified: He had never seen Henry Frazier. He had examined the hospital records and studied the blood lead level test taken at the direction of Dr. Benson. He found that report to show 0.018 milligrams of lead in 100 grams of blood. That is well within normal limits; 0.07 milligrams is the upper level of normal. The level as reported on this employee could be multiplied by five before it would be at the top level of normal.
Witness also studied the report showing 2% to 3% stippling of blood cells. There are no definite signs of lead intoxication. Stippled cells can be a sign of lead exposure. They are found in normal individuals at times. A stippling of 2% or 3%, combined with a history of working in a lead plant, is not a sufficient basis for a diagnosis of lead poisoning.
Witness also examined the above referred to urinalyses of employee. All are within the normal range of 150 to 200 micrograms per liter. Lead is a constituent normal in the excretions of everybody. Every one is in daily contact with it; it is in cigarette smoke, food containers, etc.
From an examination of employee's medical records, witness was of the opinion he died from "hypertensive cardiovascular renal disease. That is high blood pressure which has produced heart disease and kidney disease." In his opinion none of the data relating to employee was indicative of lead poisoning.
On cross examination, witness stated that if employee had lead poisoning when he was taken to the hospital on November 25th, it would have been revealed in the blood lead level test taken five days thereafter; and that no treatment would reduce it appreciably for a few months. The proper treatment is to get the patient away from the exposure and it will be slowly excreted.
It is not the province of this court to determine the case on the merits. That is the function and duty of the Industrial Commission. Our duty is to review the case for the purpose of determining whether upon the whole record the award of no compensation is supported by competent and substantial evidence. Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W.2d 647, 649; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153. 200 S.W.2d 55; Lewis v. Lowe & Campbell Athletic Goods Co., Mo.Sup., 247 S.W.2d 800.
The rule of "due deference" to the findings of the referee is not applicable in this case. The veracity of no witness is questioned. The testimony of Dr. Benson as to employee's symptoms and the hospital and laboratory records upon which he bases his diagnosis are accepted by respondent as true. It is the accuracy of the diagnosis that is questioned. This calls for an evaluation of the basis upon which Dr. Benson founded his diagnosis and his experience and training in lead poisoning cases as compared with that of respondent's witnesses, together with an evaluation of the additional data and records relating to employee and the interpretation thereof by those witnesses. The Industrial Commission could determine these matters from the written record equally as well as the referee who had the witnesses before him.
Dr. Benson repeatedy testified that his diagnosis was based upon two grounds: (1) the history given him by employee and (2) the stippled blood cells. The sufficiency of each of these grounds was questioned by respondent. As to the first: Although employee told Dr. Benson he had been a smelter for fourteen years, yet respondent's records show that from the time he began work for respondent his employment was that of a metal picker and sorter, engaged in receiving metals, and sorting and storing them. He had nothing to do with smelting or pouring molten metal. In her claim filed with the Commission, Mrs. Frazier describes employee's work as that of a "metal picker". There is no other evidence in the record on that matter. As to the second: Dr. Benson, although testifying that stippled blood cells constituted definite proof of lead poisoning, nevertheless, admitted that such cells were found in persons suffering from other diseases.
*1012 Furthermore, Dr. Benson's explanation of the failure of the blood lead level test taken five days after employee's hospitalization to show an abnormal amount of lead was likewise challenged by respondent. Respondent's witness, Dr. Miller, testified it would have been impossible for employee to have been suffering from lead poisoning on November 25th when a blood lead level test taken on November 30th showed the lead content of his blood to be within normal limits.
Respondent's evidence was not based upon guesswork as contended by claimants. While it is true that Dr. Miller never saw employee, yet he saw and accepted as correct the same hospital and laboratory records upon which Dr. Benson relied. The other data and records upon which he based his diagnosis were those made and kept by the employer over a period of years in the usual and regular course of its business. No suggestion is made that they were spurious or that they were in any manner misinterpreted. These records, as interpreted by respondent's witnesses, showed that employee was never unduly exposed to air containing lead in excess of nationally recognized limits of safety, and that the lead excreted through his urine also showed no harmful intake of lead into his system. It seems clear that Dr. Miller's conclusion that employee's death was not caused or contributed to by lead poisoning is based upon data recognized by the industry and the medical profession as an accredited method of determining such matters.
After evaluating the evidence, the Commission was not convinced that lead poisoning was a contributing cause of employee's death. That finding is based upon competent and substantial evidence.
The judgment of the trial court is affirmed.
All concur.