Katherine A. CARDWELL et al.
(Claimants), Appellants,

v.

WHITE BAKING COMPANY (Employer),
and American Insurance Company
(Insurer), Respondents.

No. 45309.

Supreme Court of Missouri,
Division No. 2.

March 11, 1957.

James B. Higgins, Jerome J. Duff, John J. Delabar, St. Louis, for claimants-appellants.

Edw. C. Friedewald, St. Louis, for respondents.

BARRETT, Commissioner.

Some time between the hours of 9:00 or 10:00 o'clock in the evening of June 16, 1952, and 1:00 o'clock in the morning of June 17, 1952, Raymond Cardwell died. He was employed by the White Baking Company as a house-to-house driver-salesman and his dependent widow and children, claiming that his death was due to a heat stroke induced by his employment, filed a claim for the death benefits provided by the Workmen's Compensation Law. V.A. M.S., Secs. 287.120, 287.240. A referee of the Division of Workmen's Compensation found that Raymond's death "was not the result of an alleged accident or accidents arising out of and in the course of

his employment." Upon review the Industrial Commission made the more detailed and elaborate finding that Raymond's death "was not the result of an accident arising out of and in the course of his employment"; that he "was not subjected that day in this employment to any greater hazard or to any greater degree of heat than the general public while driving the bakery truck"; and the commission specifically found *"that said employee's death was not due to heat prostration or heat stroke, but was due to other causes."* If any one of these specific findings of ultimate fact, Damore v. Encyclopedia Americana, Mo., 290 S.W.2d 105, particularly the finding that his death was not due to heat stroke, Williams v. International Shoe Co., Mo. App., 213 S.W.2d 657, is supported by competent and substantial evidence and is not manifestly against the overwhelming weight of the evidence the commission's award must be affirmed. Frazier v. National Bearing Division, Mo., 250 S.W.2d 1008; Vollmar v. Board of Jewish Education, Mo., 287 S.W.2d 868.

Ray was thirty years old, about six feet tall, and weighed 190 pounds. His bread route was twenty-six miles in length and he called on approximately 220 customers daily. The truck he used was a Chevrolet with a "Montpelier" metal body, designed for convenient use as a retail bread truck. June 15, 1952, was Sunday, so Ray did not work that day; he stayed home and washed his car and mowed his landlord's lawn, and in the afternoon visited friends and relatives. On Sunday the temperature reached 100 degrees and for several preceding days the temperature had reached 100 degrees. On Monday, June 16, 1952, he got out of bed about the customary time, 5 o'clock, had breakfast, and drove to the plant, checking in at 6:12. The temperature on that day ranged from a low of 75 degrees to a high of 101 degrees. Ray made his customary calls during the day. One customer offered to testify that when he came to her home in the afternoon he was soaking wet with perspiration and appeared to be ill. Three or four witnesses, employed as driver-salesmen by White Baking Company in June 1952, testified that when the temperature was around 100 degrees it was ten to fifteen degrees warmer inside the truck than outside. Ray returned to the company office shortly after 5 o'clock and, sitting in an air-conditioned room set aside for the purpose, made out his daily report. He and another employee left the plant about 6 o'clock in Ray's car and went to a tavern where they drank two bottles of beer. He arrived home about the customary hour of 7 o'clock.

His wife said that he appeared tired; his face was red and drawn. He complained that he had not felt well all day and his face, shirt, and cap were wet with sweat. He complained of a headache and said that he "liked to have burned down all day." When he came in to supper, after taking some baking soda, he was sweating profusely, and did not eat as heartily as usual. After supper he got some fishing rods from his car and returned them to his landlord. They visited for 30 or 40 minutes and the landlord said that his face was as red as a beet and that he was perspiring as if he had been under a shower. Ray told his landlord that he was hot and tired and did not feel well and that he was going to lie down. He returned to his upstairs apartment, played with the children a few minutes, removed his shirt, and lay down on a mattress on the back porch and by 9 o'clock was asleep. Mrs. Cardwell put the children to bed and then lay down on the mattress beside her husband. About 11 o'clock she shook him and attempted to awaken him but he was sound asleep and she did not succeed in awakening him. He appeared to be chilly and she covered him with a blanket. At that time she noticed that the mattress was wet beneath his head. When she again attempted to awaken him at 1 o'clock there was a discharge from his nose and she became alarmed and summoned the landlord. The landlord could see that Ray was dead and called the police and an ambulance.

454

Dr. Connor, an experienced pathologist attached to the coroner's office, performed an autopsy and all of his findings were negative except for "scattered areas of tarry congestion" in both lungs. Because of the presence of the tarry, viscid congestion in his lungs Dr. Connor certified that the cause of Ray's death was "heat stroke." It was his opinion that the congestion in the lungs was an "accumulation" due to high body temperature and produced "anoxia" causing sudden death. In answer to hypothetical questions which briefly embodied the events of the day, a description of the truck, and the temperature on June 16, 1952, Dr. Connor gave it as his opinion that Ray's working conditions caused the heat stroke and his death.

Two doctors, a pathologist and an internist, testified on behalf of the employer and the insurer. Dr. Blumenthal, the pathologist, testified that the chief characteristic of heat stroke was the absence of perspiration and the presence of extremely high body temperature, resulting in coma. He said, in the event of sudden death from heat stroke, that there were often no observable pathological symptoms or findings. He was not familiar with "tarry substance" as a medical term, but said that in autopsies it was common to find congestion or hemorrhages in the heart, lungs, kidneys, and other organs but that they did not mean death from heat stroke. In answer to a hypothetical question it was Dr. Blumenthal's opinion that Ray "didn't die of heat stroke." On cross-examination he said, "In my opinion this man died of ventricular fibrillation of his heart." He did not know the cause of ventricular fibrillation and when asked whether heat stroke could have caused it said, "I don't have any idea." The internist, Dr. Flance, said that the characteristic symptoms of heat stroke were a cessation of sweating, very dry, hot skin, mental confusion and finally delirium and coma. He said that the usual pathological finding substantiative of heat stroke was swelling of the brain with the destruction of nerve cells. In answer to a hypothetical question it was the opinion of Dr. Flance that Ray "didn't have heat stroke," and that a diagnosis of heat stroke could not be based alone upon the finding of congestion in his lungs.

The appellants say that they do not question the right of the doctors to their theoretical, textbook opinions as to the characteristics of heat stroke. But they do question and dispute the right of the commission to make a finding, based upon such testimony, that Ray's death was not due to heat stroke. It is urged, because these doctors were not familiar with "tarry congestion" and did not know whether heat stroke may have caused "ventricular fibrillation," that their opinions were mere conjecture and surmise and, therefore, did not measure up to the standards of competent, probative and substantial evidence. Because the only known symptoms were described by laymen and there was no medical treatment or examination prior to death, it may be conceded that the medical evidence was not as impressive and satisfying as one might desire; but it cannot now be claimed that the respondents' doctors were not qualified to express their opinions or that their opinions were based upon such inadequate data or reasons as to render them patently worthless. 20 Am. Jur., Secs. 867–869, pp. 730–733; Scanlon v. Kansas City, 325 Mo. 125, 28 S.W.2d 84; annotation 136 A.L.R. 965. Compare Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844. Upon this record, the cause of Ray's death, whether due to heat stroke for which his employer might be liable, or whether due to some other cause for which there was no claim that his employer was liable, was peculiarly dependent upon which one of two conflicting medical theories was to be accepted; and the commission having accepted the theories testified to by the respondents' medical witnesses, it may not be said that its finding is so contrary to the overwhelming weight of the evidence that it should be rejected

and set aside. DeLille v. Holton-Seelye Co., 334 Mo. 464, 66 S.W.2d 834; Lewis v. Champ Spring Co., Mo.App., 145 S.W.2d 758; Diebold v. Great Atlantic & Pacific Tea Co., Mo.App., 241 S.W.2d 31; Williams v. International Shoe Co., supra; Frazier v. National Bearing Division, supra; Vollmar v. Board of Jewish Education, supra. This one vital finding being supported by competent and substantial evidence, it is not necessary to consider whether the other findings are also supported by the evidence, and the judgment is, therefore, affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.