**Patrick PAVIA, Respondent,**

v.

**SMITTY'S SUPERMARKET,**
**Appellant.**

**No. 25295.**

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 30, 2003.

Motion for Rehearing or Transfer Denied
Oct. 21, 2003.

Application for Transfer Denied
Nov. 25, 2003.

J. Bradley Young, Roberts, Perryman, Bomkamp & Meives, P.C., St. Louis, for appellant.

Matthew J. Sauter, Deeba Sauter Herd, St. Louis, for respondent.

ROBERT S. BARNEY, Presiding Judge.

Appellant, Smitty's Supermarket, ("Appellant") appeals the decision by the Labor and Industrial Relations Commission ("Commission") affirming an award of the Division of Workers' Compensation, as modified. As explained more fully below, in its final award the Commission determined Respondent, Patrick Pavia, ("Claimant") was permanently and totally disabled and awarded him, *inter alia,* weekly benefits for life, and assessed a 15 percent penalty applicable to all of his benefits arising from Appellant's purported violation of sections 292.020 and 287.120.4.[1]

Claimant suffered physical injuries while working for Appellant at its facility in Waynesville, Missouri, on February 25, 1996. At that date he was working as a bagger and was attempting to obtain certain grocery store items, including packages of Kleenex, stacked in the warehouse area of the grocery store. Claimant stood on a wooden pallet and a fellow employee, an assistant manager, lifted the pallet into the air with a forklift. After he reached a height of approximately 15 to 20 feet, Claimant fell off the pallet and onto the floor of the warehouse, where he remained unconscious and unresponsive.

---

1. All statutory references are to RSMo 1994, unless otherwise stated.

After emergency treatment at a local hospital, Claimant was flown to University Hospital in Columbia, Missouri, where he was diagnosed as having a severe closed head injury, subdural hematoma, subarachnoid hemorrhaging and a cervical spine fracture. A halo placement surgical operation was performed for treatment of his cervical fracture. Claimant remained at the hospital until February 29, 1996, and then was transferred from the neurosurgery intensive care unit to the traumatic brain injury program at Rusk Rehabilitation Center, where Claimant remained until March 22, 1996. He was then enrolled in the Bridge Outpatient Program through the University Hospital receiving full-team rehabilitation, occupational therapy consultation, speech and language pathology consultation, social services consultation, physical therapy, therapeutic recreation, rehabilitation nursing, and ophthalmology consultation during the period April 1, 1996, through May 24, 1996. The Bridge Outpatient Program discharge notes indicated that Claimant continued to display cognitive dysfunction, including distractibility and inattention. He also continued to have difficulty with reading comprehension and mathematic skills. It was recommended that Claimant be scheduled for a full battery of neuropsychological testing in the future.

Claimant filed for workers' compensation benefits. Following a contested hearing, an Administrative Law Judge (ALJ) found, *inter alia*, that Claimant "suffered a 20% Permanent Partial Disability of the body as a whole at the level of his neck resulting from the C–6 fracture, and a 50% Permanent Partial Disability of the body as a whole referable to [Claimant's] traumatic brain injury" and determined that he was 70 percent permanently disabled. Additionally, the ALJ found that Appellant's assistant manager had failed to utilize an available safety cage when elevating Claimant with a forklift, and that no notice was posted by Appellant warning of the dangers of elevating an employee on the fork lift without using the safety cage. Accordingly, the ALJ determined that Appellant should be assessed a 15 percent penalty, to be added to Claimant's permanent partial disability award for failure to comply with the safety provisions of section 292.020. Following the ALJ's rendition of her decision, Appellant filed its application for review before the Commission.

The Commission modified the ALJ's decision. It determined that Claimant was permanently and totally disabled and awarded him weekly benefits in the amount of $460.00 per week for life, inclusive of a 15 percent penalty awarded pursuant to sections 292.020 and 287.120.4, together with additional monies representing the 15 percent penalty as applied to Claimant's medical expenses and his temporary total disability payments. This appeal follows.

Appellant complains the Commission erred in its award. It maintains there was no substantial evidence supporting the Commission's determination that Claimant was totally disabled and asserts the Commission erred as a matter of law when it failed to follow the statutory calculation process set forth in section 287.250 when the Commission determined Claimant's wage rate. Appellant also complains the Commission erred in awarding penalties pursuant to section 287.120.4 because Claimant failed to present evidence of a violation of this subsection.

Section 287.495.1, RSMo 2000, governs our review. It sets out, in pertinent part:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside

the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

§ 287.495.1, RSMo 2000; *see Rono v. Famous Barr,* 91 S.W.3d 688, 691 (Mo.App. 2002).

When reviewing the sufficiency of the evidence, the Court is limited to determining whether the Commission's award is supported by competent and substantial evidence on the whole record. The evidence and inferences are reviewed in the light most favorable to the award, and the Commission's findings will be set aside only when they are clearly contrary to the overwhelming weight of the evidence. *Akers v. Warson Garden Apts.,* 961 S.W.2d 50, 52–53 (Mo. banc 1998); *Curry v. Ozarks Elec. Corp.,* 39 S.W.3d 494, 495 (Mo. banc 2001); *Chatmon v. St. Charles County Ambulance Dist.,* 55 S.W.3d 451, 455 (Mo.App.2001).[2]

■■■ "The Commission reviews the record, and, where appropriate, it will also determine the credibility of witnesses and the weight of their testimony, resolve any conflicts in the evidence, and reach its own conclusions on factual issues *independent* of the ALJ." *Shaw v. Scott,* 49 S.W.3d 720, 728 (Mo.App.2001).[3] "[A]n ALJ's final award is not 'final' when review by the Commission is sought. An ALJ's final award is not 'final' because it remains tentative, provisional, contingent, and subject to revision by the Commission." *Id.*

■■■ Commission "[d]ecisions that are interpretations or applications of law, rather than determinations of fact, are reviewed for correctness without deference to the Commission's judgment." *Maxon v. Leggett & Platt,* 9 S.W.3d 725, 729 (Mo. App.2000).

■■■ "The workers compensation law should be construed liberally to further the goal of placing upon industry the losses sustained by employees from work-related injuries." *Goerlich v. TPF, Inc.,* 85 S.W.3d 724, 730 (Mo.App.2002). "Thus, 'any question as to the right of an employee to compensation must be resolved in favor of the injured employee.'" *Id.* (quoting *Brenneisen v. Leach's Standard Serv. Station,* 806 S.W.2d 443, 445 (Mo. App.1991)).

In Appellant's first point, Appellant maintains the Commission erred as a "matter of law in its decision to modify the decision of the of the [ALJ] and award permanent total disability in that the deci-

---

**2.** In our review, we engage in a two-step process. *Seeley v. Anchor Fence Co.,* 96 S.W.3d 809, 814 (Mo.App.2002). We initially determine whether the whole record viewed in the light most favorable to the award of the Commission contains sufficient competent and substantial evidence to support its award. *Id.* at 814–15. If we find it does, then we make a determination as to whether the award is against the overwhelming weight of the evidence. *Id.* at 815. In this latter step, all the evidence in the record is considered, including that unfavorable to the award made by the Commission. *Id.; see Davis v. Re-*search *Med. Ctr.,* 903 S.W.2d 557, 570 (Mo. App.1995); *see also Loyd v. Ozark Elec. Coop., Inc.,* 4 S.W.3d 579, 584 (Mo.App.1999).

**3.** In this case the Commission adopted the findings of fact and conclusions of law of the ALJ on all issues except the nature and extent of Claimant's disability and future medical treatment. Accordingly, we review the remaining portions of the ALJ's decision as part of the Commission's determination. *See Loyd,* 4 S.W.3d at 584.

sion was not supported by substantial evidence because no doctor, no vocational expert, nor even the employee testified that the employee was permanently and totally disabled."

We note that the term "total disability" is "defined as the inability to return to any employment and not merely the inability to return to the employment in which the employee was engaged at the time of the accident." *Sullivan v. Masters Jackson Paving Co.*, 35 S.W.3d 879, 884 (Mo.App.2001); § 287.020.7. "It does not require that the claimant be completely inactive or inert." *Sifferman v. Sears Roebuck and Co.*, 906 S.W.2d 823, 826 (Mo.App.1995); *see also Brookman v. Henry Transp.*, 924 S.W.2d 286, 290 (Mo. App.1996); *Reiner v. Treasurer, State of Missouri*, 837 S.W.2d 363, 367 (Mo.App. 1992).

"To determine if claimant is totally disabled, the central question is whether, in the ordinary course of business, any employer would reasonably be expected to hire claimant in his present physical condition." *Ransburg v. Great Plains Drilling*, 22 S.W.3d 726, 732 (Mo.App.2000); *see also Massey v. Missouri Butcher & Cafe Supply*, 890 S.W.2d 761, 763 (Mo.App. 1995).

"The 'extent and percentage of disability is a finding of fact within the special province of the Industrial Commission.'" *Eimer v. Bd. of Police Comm'rs*, 895 S.W.2d 117, 120 (Mo.App.1995) (quoting *Fogelsong v. Banquet Foods Corp.*, 526 S.W.2d 886, 892 (Mo.App.1975)). "The Commission may consider all of the evidence, including the testimony of the claimant, and draw all reasonable inferences in arriving at the percentage of disability." *Sifferman*, 906 S.W.2d at 826.

"The testimony of … lay witnesses as to facts within the realm of lay understanding can constitute substantial evidence of the nature, cause, and extent of the disability, especially when taken in connection with, or where supported by, some medical evidence." *Eimer*, 895 S.W.2d at 120; *Ransburg*, 22 S.W.3d at 732.

"The Commission is not bound by the expert's exact percentages and is free to find a disability rating higher or lower than that expressed in medical testimony." *Sifferman*, 906 S.W.2d at 826; *Buskuehl v. The Doe Run Co.*, 68 S.W.3d 535, 540 (Mo.App.2001). "The acceptance or rejection of medical evidence is for the Commission." *Sullivan*, 35 S.W.3d at 884–85. "The decision to accept one of two conflicting medical opinions is a question of fact for the Commission." *Chatmon*, 55 S.W.3d at 457. "When the Commission believes that the ratings of the physicians are too conservative it has the power to increase the rating by an appropriate amount." *Buskuehl*, 68 S.W.3d at 540; *Wiedower v. ACF Indus., Inc.*, 657 S.W.2d 71, 74 (Mo.App.1983).

As previously set out, "we defer to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony." *Chatmon*, 55 S.W.3d at 455–56. "If the evidence before the Commission 'would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding.'" *Id.* (quoting *Pulitzer Pub. Co. v. Labor & Ind. Rel. Comm'n*, 596 S.W.2d 413, 417 (Mo. banc 1980)); *see also Board of Education v. Shank*, 542 S.W.2d 779, 782 (Mo. banc 1976).

We now consider the evidence in the light most favorable to the Commission's findings, as we must. *West v. Posten*

*Const. Co.,* 804 S.W.2d 743, 744 (Mo. banc 1991).

 The record shows that Claimant was seventeen years old at the time of the accident on February 25, 1996. He had previously lettered in varsity baseball, basketball and golf in high school, he was co-editor of his high school newspaper, and planned to attend journalism school after high school. He testified he planned on continuing work at Smitty's Supermarket while attending college in Springfield, Missouri.

Testimony from Claimant, as well as his parents, revealed that after his hospitalization and post-hospital medical treatment, Claimant attempted to live independent of his family but ultimately had to return to the family home. His parents testified Claimant was simply unable to handle his financial affairs, would forget to pay his bills, and had neither a checking account, savings account or credit cards, and had to be continually reminded by his parents of their requests to perform even the simplest of tasks.

Claimant's father, Mike, testified that Claimant "basically bummed out of school, just couldn't take the bookwork." He related that his son now has to write something down, he won't remember it. He also stated that Claimant has a great deal of difficulty multitasking and that he now lacks self-esteem. Mike testified that he was familiar with Claimant's job at the car dealership where he described Claimant's job as basically an assistant who performs errands for all the other employees at the dealership. Claimant's mother, Beth, testified that her son had difficulty studying, working and living on his own. She related Claimant was extremely embarrassed regarding his head injury.

Neuropsychological testing performed by John R. Hogg, Ph.D., on March 14, 1996, determined that Claimant's intellectual abilities were well below estimates of his pre-injury cognitive functioning. He was diagnosed by Dr. Hogg as having an organic personality syndrome (cognitive impairment) secondary to closed head injury. The test results indicated that Claimant's verbal memory and language disturbances would result in significant decreases in work and academic efficiency.

Claimant participated in the Bridge Outpatient Rehabilitation Program at University Hospital from April 1, 1996, through May 24, 1996. Claimant continued to display cognitive dysfunction including distractibility and inattention. He continued to have difficulty with reading comprehension and math skills.

Dr. Laura Schopp performed a follow-up neuropsychological evaluation on March 31, 1998, about two years after the accident. Neuropsychological testing indicated that Claimant continued to show weaknesses in attention, mathematics, visual perception, tactile discrimination, and cognitive flexibility. Academically, Claimant demonstrated "severely impaired higher order math skills, moderately impaired written language abilities, and mildly impaired simple math calculation abilities."

Dr. Janie Vale, an occupational medicine specialist, testified that she had examined Claimant in August of 1996 at Appellant's request. He related to her that he was experiencing memory problems and gave the example that he could be told to do two or three things but would only remember one. He reported slowness of speech and mumbling at times.

It was Dr. Vale's medical opinion that Claimant had sustained a C–6 vertebral fracture, which had required surgical reduction and treatment with a halo vest; skull fractures; and subdural and subarachnoid bleeding. On his September 17, 1997, visit, Dr. Vale opined that Claimant

had reached "stabilization of his conditions" but recommended it would be appropriate to leave his medical care open for a period of five years for the remote possibility of deterioration in his cognitive status or development of a seizure disorder. She opined at that time that Claimant had suffered a 20 percent permanent partial impairment of the body as a whole related to his brain injury and the C–6 fracture.

On May 10, 1999, Dr. Vale examined Claimant again and ordered an MRI study which was performed later in the summer. On August 30, 1999, Dr. Vale opined, the MRI revealed focal cortical atrophy of the left occipital lobe which Dr. Vale opined was related to Claimant's prior trauma. She also noted some mild enlargement of the ventricles. Based on the MRI findings of the occipital lobe focal atrophy, Dr. Vale increased her previous impairment level and assessed a 25 percent permanent partial disability of the body as a whole related to the traumatic brain syndrome and the C–6 cervical spine injury. She determined Claimant had "reached maximum medical improvement" and that the atrophy in his brain as shown by the August 1999 MRI, is from the accident and believes the atrophy she saw on the left occipital lobe was objective evidence of why Claimant was experiencing cognitive difficulties. Dr. Vale considered Dr. Schopp's neurological evaluation findings to be objective findings and agreed with Dr. Schopp's opinion that Claimant continued to show impairment in visual perception, visual memory, mental speed and flexibility, including organization and planning. Dr. Vale also agrees that Claimant demonstrates severely impaired higher order math skills, moderately impaired written language abilities, and mildly impaired simple mathematical calculation abilities, and that these maladies are related to his work accident. Dr. Vale attributes Claimant's clumsiness to his accident, as well as his impaired academic skills. Lastly, Dr. Vale agreed that Claimant will have earlier degenerative changes in the area of his neck as a result of his work injury.

Dr. Raymond Cohen, a neurologist, first saw Claimant on October 27, 1998. Claimant related to him that: (1) he had problems with his temper since the accident and that his patience was very short; (2) his attention span was very poor; (3) he had tried to take college classes but could not concentrate and did not do well; and (4) that drinks would fall out of his hand and if there was a glass or something in front of him, he would frequently knock it off the table. Claimant also related he forgets what is in front of him and will move his hand before he is able to see the object and it will be knocked over. He explained to Dr. Cohen that he had difficulty catching a ball because he could not coordinate his arms with seeing the ball and when he attempted to grasp or grab at something he would frequently miss it. Claimant related he felt "off-balance," and continued suffering pains in his neck— described as deep-aching-like sensation.

Dr. Cohen testified that Claimant's problems were "all consistent with a severe type of brain injury or a type of dementia from a brain injury." Dr. Cohen testified that the MRI scans revealed blood in several areas of the brain, that there was blood around the inside and outside of the brain, and that he suffered a skull fracture, a neck fracture, and had signs of cerebral swelling.

In the physical and neurological exams performed on Claimant, Dr. Cohen initially diagnosed Claimant as having sustained a subdural hematoma, as well as a subarachnoid hemorrhage. Claimant also suffered cognitive dysfunction secondary to his head injury and was further diagnosed as

having a C–6 fracture, which required a surgical halo placement for stabilization. By cognitive dysfunction, Dr. Cohen meant an abnormality of thinking; an abnormality of using the brain's various functions that it normally would carry out. It was Dr. Cohen's opinion that Claimant's C–6 fracture would bother him in the future and that he would suffer from traumatically induced arthritis.

At the time of this initial evaluation, Dr. Cohen believed that Claimant had a 40 percent permanent partial disability of the body as a whole referable to the brain injury and a 27.5 percent permanent partial disability of the body as a whole at the level of his neck.

Dr. Cohen examined Claimant, again, on May 15, 2000. On this occasion he had the benefit of MRI scans performed on Claimant on May 10, 1999, and August 4, 1999, including two follow-up notes from Dr. Janie Vale.

Dr. Cohen noted a fairly large black area in the left occipital side of Claimant's brain that represented atrophy or loss of brain tissue. He explained the occipital area of the brain is the back part of the brain on the left side responsible for interpreting information that comes through the eyes. He noted that Claimant's clumsiness and difficulty with visual perception are all tasks that are processed in the left occipital area of the brain. Dr. Cohen also noted that the ventricles in Claimant's brain were now very large and very wide, typically seen with dementia or some type of brain abnormality. He opined that this was objective evidence that verifies some of Claimant's complaints. Dr. Cohen determined that Claimant's brain was now overall smaller than it should be in a person of his age. It was Dr. Cohen's medical opinion that Claimant had suffered a severe head injury and that between Claimant's initial visit with him and the May 15,

2000, visit, Claimant's disability had become worse and he had severe abnormalities on the MRI considering he was a young patient. While he felt that Claimant's permanent partial disability with respect to his neck remained at 27.5 percent, he also opined that Claimant's brain disability resulted in a 60 percent permanent partial disability of the person as a whole. Dr. Cohen felt that Claimant had an extremely poor prognosis for occupational situations in the future and would be limited from any type of job in which he had to do any significant thinking or evaluating of information, particularly if he had to remember anything. Dr. Cohen believed that Claimant would have no further improvement in terms of his cognitive development in the future.

Claimant testified that he has attempted to work as a waiter at Cracker Barrel restaurant. He testified that he had problems placing food and beverage items on tables and that during the approximate six weeks he worked there he spilled items on customers on 4 or 5 occasions. He also testified he had difficulty in remembering customers' orders. He worked as a bellman at a local Holiday Inn. He stated he had problems with his memory and would often carry people's luggage to their rooms and forget the room number on the way to the room. Later, he attempted to work as a car salesman at Seller Sexton Automobile Dealership. He was unable to keep up with the productivity of the other salespersons. He related that he felt ashamed because he was unable to do the math associated with "booking out a vehicle." He stated that he has tried to quit his job on several occasions because he feels like he is being "treated like a gofer." He also relates he is frustrated working at the car dealership because there "is a lot for [him] to do." Lastly, Claimant relates that he has no plans for the future.

We determine that while Claimant had a job performing a variety of small tasks with the auto dealership at the time of the hearing this does not automatically preclude the Commission from determining that he was totally disabled under the provisions of section 287.020.7. As previously related, total disability "means the inability to return to any reasonable employment. It does not require that the claimant be completely inactive or inert." *Smith v. Richardson Bros. Roofing,* 32 S.W.3d 568, 573 (Mo.App.2000); *Cochran v. Industrial Fuels & Res., Inc.,* 995 S.W.2d 489, 497 (Mo.App.1999); *Sifferman,* 906 S.W.2d at 826.

In *Grgic v. P & G Const.,* 904 S.W.2d 464 (Mo.App.1995), the claimant had problems remembering, concentrating and processing information following being struck on the head with a baseball bat while at work. As a result he suffered from reduced physical coordination and reduced use of his right arm, and had speech difficulties that caused considerable confusion in communication. *Id.* at 465. The Eastern District of this Court reversed an award which had previously determined the claimant was 65 percent permanently partially disabled, based, in part, on the fact that he was able work on rudimentary tasks, albeit during limited hours. In reversing, the Court noted that the "limited activity does not mitigate against a finding of total disability," *id.* at 466, and determined that the Commission "erred in not granting Mr. Grgic the total disability award to which he is entitled by law." *Id.* at 467.

In *Gordon v. Tri–State Motor Transit Co.,* 908 S.W.2d 849 (Mo.App.1995), claimant was 56 years old with a GED. While one vocational specialist testified that he did not believe there were any occupational opportunities available to the claimant, another vocational specialist opined that the claimant could work as a self-service gas station cashier, gate tender, or service establishment counter attendant. One examining physician opined that while employee was unable to return to work as a truck driver, he "was not saying he was unable to do any job." *Id.* at 853. The physician also testified that employee could sit, stand and walk; was capable of lifting smaller articles and that there were other occupations he could perform in the marketplace, such as working in a hardware store. *Id.*

Another examining physician issued a report that the *Gordon* claimant was not totally and permanently disabled, and although the claimant had trouble with overhead activities involving his right arm and any job requiring the use of his right shoulder and arm, or bending and stooping, he, nevertheless, had the capacity for some useful work activities. *Id.*

The *Gordon* claimant testified that he had been able to perform some physical jobs since his accident, such as assisting in the installation of siding on his house, building and helping install cabinets in a house, and doing some body work on his own automobiles, including installing a battery in one of his vehicles. He also related he performed some household jobs and operated a backhoe for short periods of time. *Id.* at 853–54. The *Gordon* claimant related that he was uncomfortable when he performed the foregoing tasks and took extended time to complete them and had to rest for at least fifteen minutes after forty-five minutes of physical activity. *Gordon,* 908 S.W.2d at 853–54.

The Commission determined that given the age, education and physical condition of the *Gordon* claimant, no employer could be expected to employ him and found the claimant to be permanently and totally disabled. *Id.* at 854. This Court affirmed the Commission's determination and award

finding that "[t]here was substantial evidence in the record to support this finding." *Id.*

Here, Claimant was seventeen years old when he suffered significant head injuries, as previously set out. Dr. Cohen ultimately determined that Claimant had 27.5 percent permanent partial disability of the body as a whole at the level of his neck, and 60 percent permanent partial disability of the body as a whole referable to his brain injury. Claimant had few work experiences prior to his injury, and has no transferable skills arising from his limited work experiences. As the Commission noted, lay and medical testimony found in the record revealed that Claimant's brain injury caused Claimant to suffer physical limitations manifested in disorientation, clumsiness and difficulty with visual perception. Claimant has difficulty grasping objects and is limited in his ability to engage in multi-task activities. He has difficulty in handling money and paying his bills. He suffers from low self-esteem and relates that he is frustrated working at the car dealership because there "is a lot for [him] to do." Under these circumstances the Commission determined that no employer could be expected to employ him and that he is permanently and totally disabled.

As previously noted, the Commission does not have to make its decision only upon testimony from physicians; it can make its findings based on the entire evidence.[4] *Smith,* 32 S.W.3d at 573; *see Eimer,* 895 S.W.2d at 120. "In determining the percentage of disability, the Commission is not bound by the percentage estimates of medical experts and it may consider all of the evidence, including the testimony of the employee and all reasonable inferences." *Eimer,* 895 S.W.2d at 120. We will not substitute our judgment on issues of fact for that of the Commission even if we would have made a different conclusion. *See Gordon,* 908 S.W.2d at 852.

We determine that the Commission's final award, finding Claimant permanently and totally disabled, was supported by substantial and competent evidence and was not against the overwhelming weight of the evidence. *Loyd,* 4 S.W.3d at 584; *Davis,* 903 S.W.2d at 571. Point One is denied.

We now turn to Appellant's Point Two. As best we discern, Appellant challenges the Commission's determination that Claimant, as a minor at the time of the accident, was entitled to receive an award for his disability, pursuant to section 287.250.6,[5] based on an adjusted average weekly wage rate of $600.00. Appellant

---

4. Because neither Dr. Cohen nor Dr. Vale, or any other expert witness, provided live testimony before the ALJ " 'the Commission could determine their credibility from the written record equally as well as' the ALJ." *Davis,* 903 S.W.2d at 573; *Frazier v. National Bearing Div.,* 250 S.W.2d 1008, 1011 (Mo.1952); *see also Buskuehl,* 68 S.W.3d at 542.

5. Section 287.250.6 reads as follows:

For purposes of establishing a rate of compensation applicable only to permanent partial disability, permanent total disability and death benefits, pursuant to this chapter, *the average weekly wage for an employee who is under the age of twenty-one years shall be adjusted to take into consideration the increased earning power of such employee until she or he attains the age of twenty-one years* and the average weekly wage for an employee who is an apprentice or a trainee, and whose earnings would reasonably be expected to increase, shall be adjusted to reflect a level of expected increase, based upon completion of apprenticeship or traineeship, provided that such adjustment of the average weekly wage shall not consider expected increase for a period occurring more than three years after the date of the injury. (Emphasis added.)

argues the Commission failed to follow the correct "statutory calculation process" as set forth in the subsection because it "based its decision on evidence of outside employment that the Legislature never intended to apply to the wage rate calculation process." What "outside employment" Claimant engaged in is not identified anywhere in Appellant's second point.

Despite the ambiguities attendant to Appellant's second point relied on, we are able to ascertain from the argument portion of its brief that Appellant chiefly complains there was a lack of evidence showing that Appellant contemplated promoting Claimant beyond the position of a "bagger." Accordingly, Appellant argues there was no way in which the Commission could have extrapolated a calculation that Claimant would be earning a weekly wage of $600.00 a week by the time Claimant reached the age of 21 years. Appellant asserts that "[Claimant] testified that he was earning an hourly rate of $5.15 at the time of the accident. Utilizing the calculation process found in section 287.250.3, the [Commission] should have calculated an Average Weekly Wage of $154.50, amounting to a compensation rate of $103.00."

Appellant correctly sets out the primary principle governing our construction of a statute is that when construing a statute, courts must "ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Farmers' & Laborers' Co-op. Ins. Ass'n v. Dir. of Rev.*, 742 S.W.2d 141, 145 (Mo. banc 1987).

In the plain reading of sub-section 287.250.6 we observe that it appears to have two primary thrusts. The first portion of the sub-section substantially incorporates long-standing language, set out in italics, *see supra* p. 239 and note 4, mandating that in determining the rate of cer-

tain disability compensation, "the average weekly wage for an employee who is under the age of twenty-one years shall be adjusted to take into consideration the increased earning power of such employee until she or he attains the age of twenty-one years." § 287.250.6; *see Horrell v. Chase Hotel, Inc.*, 174 S.W.2d 881, 883 (Mo.App.1943); *Nordhaus v. Lechtman Printing Co.*, 84 S.W.2d 422, 423 (Mo.App. 1935); *see also Johnson v. Kruckemeyer*, 224 Mo.App. 351, 29 S.W.2d 730, 732 (Mo. App.1930).

Additionally, in 1992 the Legislature incorporated language into the same subsection, requiring a similar, upward adjustment of earnings in situations where apprentice or trainee's earnings would reasonably be expected to increase upon completion of an apprenticeship or traineeship. § 287.250.6; *see also* MoBar CLE, "Workers' Compensation Law" § 6.11 (2nd ed).

In our analysis we first note that section 287.250.4 specifically sets out that:

If pursuant to this section the average weekly wage cannot fairly and justly be determined by the formulas provided in subsections 1 to 3 of this section, the division or the commission may determine the average weekly wage in such manner and by such method as, in the opinion of the division or the commission, based upon the exceptional facts presented, fairly determine such employee's average weekly wage.

§ 287.250.4.

Ascertaining the rate of compensation applicable to an injured minor under section 287.250.6, constitutes an "exceptional" fact under section 287.250.4. This is because in establishing the rate of compensation for a disabled minor, the Legislature has required that the Commission adjust a minor's expected earnings to "take into consideration the increased

earning power of such employee until she or he attains the age of twenty-one years." § 287.250.6. "In the very nature of the matter, no positive and absolute standard [can] be laid down as a basis for computing a minor's future earning power during minority. It follows that evidence to prove such earning power must necessarily rest largely on probabilities." *Horrell*, 174 S.W.2d at 885.

In calculating an adjusted increase of the earning power of a minor upon reaching twenty-one years of age, it is our view that there is nothing in the statutory language of section 287.250.6 that prohibits the Commission from considering evidence of wages earned from "outside employment"—either wages earned by the minor himself, in his minority, or wages earned by a similarly situated paid employee of either the employer or any other employer. Indeed, it is in keeping with the efficacious intent of the Legislature to provide minors with "the benefit of their developing and increasing earning powers during minority as a basis for further compensation, and not restrict and confine them to the basis of compensation provided for the category or status occupied at the time of the injury." *Horrell*, 174 S.W.2d at 885.

In *Kruckemeyer*, a minor claimant working in a machine shop received wages of $8.00 a week. He was injured and was determined to be permanently partially disabled. The record showed that claimant performed the same duties, for the most part, as the adult machinists and men performing the same kind of work as claimant, but unlike claimant, received from $15 to $30 a week as wages. *Kruckemeyer*, 29 S.W.2d at 731. The Commission awarded the *Kruckemeyer* claimant compensation for his permanent partial disability, at the rate of $12.00 a week. *Id.* It did so by utilizing the predecessor ver-

sion of section 287.250.6 in combination with a statutory provision similar to that of section 287.250.1(6). This latter sub-section set out that:

In the case of injured employees who earn either no wages or less than the earnings of adult day laborers in the line of employment in that locality, the yearly wage shall be reckoned according to the average annual earnings of adults of the same class in the same (or if that is impracticable then of neighboring) employments.

*Kruckemeyer*, 29 S.W.2d at 731.

In affirming the Commission's action, the appellate court observed that both sections "are not contradictory, and, in so far as they deal with different features of the same general subject-matter, it is our duty to read them together, and to harmonize them if possible." *Id.* at 732. The appellate court noted that the sub-section of the statute providing for wages determined "according to the average annual earnings of adults of the same class in the same ... employments," *id.*, could also be "considered as establishing a minimum basis for the compensation to be paid to a minor in any event, whereas [the predecessor version of section 287.250.6] fixed the maximum basis for compensation, if such special and extraordinary facts and circumstances are present in the case as to warrant its application." *Id.*

With regard to the projected income of a minor under section 287.250, we agree that sufficient evidence must be presented to warrant a finding of probability of increased earning power, and the probable amount thereof, to support the Commission's award. *Prater v. Executive Int'l, Inn.*, 792 S.W.2d 650 (Mo.App.1990). "Employee is not automatically entitled to increased benefits if found to be a minor." *Id.* "A claimant has the burden of proving all of the material elements of the claim,

and that includes sufficient proof for the Commission to determine the proper compensation rate." *Smith*, 32 S.W.3d at 575.

*Horrell* is the seminal case interpreting the predecessor provision of what is now section 287.250.6. The case involved a 19 year-old hotel employee who had graduated from college and worked as an elevator operator at the time of his injuries. He testified that "after you take your turn you move up in line to number one boy—first you are a bellboy, then number one bellboy; you start in as elevator operator, then bellboy, then you move along and move up to desk clerk. . . ." *Id.* at 883–84. He was the "number one elevator boy at the time he was hurt; that he was then ready to move up to the position of bellboy." *Id.* at 884.

An assistant manager for another hotel testified on behalf of the *Horrell* claimant. The witness related he had been in the hotel business eight years, and that the "usual step is for an elevator operator to take a position as a bellboy" and that a "boy with a high school education and possessing the factors of personality and character is competent to perform the work of a room clerk or desk clerk, or junior accountant." *Id.*

A witness for the hotel testified that the "employer wished to give the minor employee an opportunity to progress according to his ability and wanted to give him a promotion." The witness stated that the employee "is a swell kid." *Id.* Additionally, the record revealed that "[t]here was evidence . . . that such promotions as those mentioned . . . carried with them increases in compensation." *Horrell*, 174 S.W.2d at 884.

Against hotel's claim that there was insufficient evidence presented to make an award of increased earnings under the predecessor version of section 287.250.6, the reviewing court noted there "was sub-stantial evidence showing that the minor employee was in line for promotion to various successive positions which carried with them increased compensation, and that it was the desire and intention of the employer to promote the employee in accordance with his ability." *Id.* The court then reversed the prior determination by the Commission of the inapplicability of the predecessor version of section 287.250.6 to the *Horrell* claimant, and remanded the cause to the Commission for rehearing in order to redetermine the rate of compensation to be paid the minor *Horrell* claimant. *Id.* at 886.

In the instant matter, Claimant related that in high school he had been an average student, had played three varsity sports and was hopeful he could play varsity golf in college. He testified he contemplated going to school at SMS in Springfield, Missouri, and work on a *part-time* basis for Appellant at its Springfield supermarket. However, it is clear from his testimony, and that of Appellant's managers, that no Appellant's manager had promised him a specific job in the future, unlike the Horrell claimant.

To the question, "Did [a manager] ever make you any specific promises with regard to positions that you might hold?," Claimant answered, "Here's [sic] no positions, nothing guaranteed, No." Furthermore, to the question, "Did anyone at Smitty's ever tell you that you would be qualified for the position of a dairy clerk?," Claimant answered, "There at Smitty's or up in Springfield Smitty's?," "[Question] In Springfield Smitty's?," "[Answer by Claimant] No." To the question, "Did anyone at any time tell you that you would be qualified for a clerk position in the Springfield store?," Claimant answered, "No." "[Question] Did anyone at Smitty's at any location ever discuss with you or make any

promises about any future pay raises?," Claimant answered, "No, they didn't talk about raises at all."

Also, while David Childs testified that he had worked his way up from part-time stocker to frozen food manager, to night crew manager, and then to assistant manager after four years and was presently earning at the rate of $600.00 a week, it is apparent he had been working as a full time employee in these later, managerial positions. On the other hand, Claimant sought only part-time work in conjunction with attending college to become a journalist.

Based on the foregoing, we conclude that there was insufficient evidence presented tending to show that Claimant would have risen to a position similar to that of an assistant manager, with a concomitant rate of pay, in Appellant's business upon reaching his majority. The Commission erred in calculating a rate of compensation based on its adjusted average weekly wage of $600.00. § 287.495.1.

However, the record also shows that despite his disability Claimant, commendably, worked for an auto dealership for a period of time during his minority, performing at times what Claimant described as "gofer" work. In May of 1999, less than a year from his turning twenty-one, Claimant earned at the rate of $7.00 per hour based on a 40 hour work week.[6]

The legislative requirement set out in section 287.250.6, mandates that in estab-lishing a rate of compensation applicable to a disabled minor, the average weekly wage "*shall* be adjusted" to take into consideration the increased earning power of such employee until she or he attains the age of twenty-one. *Id.* (emphasis added); *Horrell,* 174 S.W.2d at 885. Here, the Commission could have calculated Claimant's potential earnings pursuant to sections 257.250.6 and 287.250.4, using, *at a minimum,* the basis of an average weekly wage of $300.00 a week ($7.50 × 40). *See* parallel discussion in *Kruckemeyer.*

Point Two is sustained in part. We reverse the portion of the Commission's award based on the ascertainment that Claimant's adjusted average weekly wage would be $600.00, and remand the matter to the Commission for a determination, consistent with this opinion, of Claimant's rate of compensation per sections 287.250 and 287.200.

In its third Point Relied On, Appellant maintains the Commission erred as a matter of law in its decision to award penalties of 15 percent on the benefits accorded Claimant, pursuant to section 287.120.4, because there was no prerequisite showing of violation of any provision of section 287.120.4.[7]

Appellant notes in its argument that essentially, the Commission reasoned that Claimant was entitled to augmentation of 15 percent on the benefits accorded him because the forklift where Claimant was standing was not shielded or guarded in

---

6. Under the circumstances of his case, we do not criticize Claimant for his efforts. To do so " 'would tend to encourage idleness on the part of injured employees and discourage them from making efforts to help themselves for fear that any activity on their part might furnish evidence against their right to the compensation which the law has provided for them.' " *Grgic,* 904 S.W.2d at 466 (quoting *Kinyon v. Kinyon,* 230 Mo.App. 623, 71 S.W.2d 78, 82 (1934)).

7. Section 287.120.4 provides, in pertinent part, that:

> Where the injury is caused by the failure of the employer to comply with any statute in this state or any lawful order of the division or the commission, the compensation ... provided for under this chapter shall be increased fifteen percent.

violation of section 292.020.[8] Appellant argues that there was no substantial evidence presented that the failure to place a guard around the forks of the forklift constituted a violation of section 292.020, and that no provision of section 292.020 applies to the guarding of fork lifts.

Regarding section 287.120.4, we observe that the "purpose of the penalty is to encourage employers to comply with the laws governing safety." *Parker v. Springfield Ry. Servs.*, 897 S.W.2d 103, 108 (Mo. App.1995).

"Section 292.020 requires machinery to be properly guarded or notice posted 'in all manufacturing, mechanical and other establishments in this state.'" *Akers v. Warson Garden Apts.*, 961 S.W.2d 50, 53 (Mo. banc 1998) (quoting § 292.050). The term "machine" in conjunction with section 292.020 has "'often been held to include every mechanical device or combination of mechanical power and devises to perform some function or to produce a certain effect or result.'" *Loyd*, 4 S.W.3d at 585 (quoting *Lumatz v. American Car & Foundry Co.*, 217 Mo.App. 94, 273 S.W. 1089, 1090 (1925)). "'A mechanical establishment is broad enough, we think, to cover almost any plant or place where machinery is set up and operated.'" *Id.* (quoting *Tatum v. Crescent Laundry Co.*, 201 Mo.App. 97, 208 S.W. 139, 143 (1919)).

This Court has previously held that a "provision for guarding machinery would ordinarily be thought of as protection against mechanical injuries, but the remedial statute should be construed with some breadth." *Parker*, 897 S.W.2d at 108.

In *Parker*, this Court affirmed the assessment of a 15 percent penalty in a case involving the electrocution of Claimant's decedent, arising from welding activities that required the use of an electric power source known as a "welder" or "welding machine," a wire feeder, cables to carry the wire, and a "stinger" with a trigger. *Id.* at 105. We determined that there was sufficient and competent evidence to support the penalty award of the Commission on the basis that general warnings about the dangers of electricity were not adequate to direct attention to specific problems of the welding assembly; or that there should have been express warnings about the dangers in adjusting the tension while the unit was energized; or that the fraying of insulation was a violation of the "guarding requirements," and that this condition contributed to the accident. We also noted the employer had no program for inspecting the insulation on the cables for worn places. *Id.* at 108.

In *Loyd*, this Court also affirmed the Commission's imposition of a 15 percent penalty under section 287.120.4, finding substantial and competent evidence supported the Commission's determination that an electric utility's pad-mounted transformer for an underground electrical distribution system was a "machine" subject to the provisions of section 292.020, requiring that machinery be safely guarded, when possible, or warned against, when not. *Id.* at 587.

Here, the record shows that a "safety cage"—hence a guarded or shielded forklift—was available for use by personnel at Appellant's store at the time of

---

8. Section 292.020 provides, in pertinent part, that:

The belting, shafting, machines, machinery, gearing and drums in all manufacturing, mechanical and other establishments in this state, when so placed as to be dangerous to persons employed therein or thereabout while engaged in their ordinary duties, shall be safely and securely guarded when possible; if not possible, then notice of its danger shall be conspicuously posted in such establishments.

the accident. However, Appellant's employee, an assistant manager, failed to utilize the safety cage in conjunction with the fork lift when he lifted Claimant some 15 feet into the air to retrieve boxes on a third shelf. Additionally, there was no sign posted in the area by Appellant warning personnel not to use the forklift in the absence of the safety cage in place on the forklift.

Based on the teachings of *Parker* and *Loyd* we cannot say that the Commission erred as a matter of law in imposing a 15 percent penalty pursuant to sections 287.120.4 and 292.020. We find there was substantial and competent evidence supporting the award of the Commission based on Appellant's violation of the safety statute at the time of the accident, when its assistant manager employee failed to use the safety cage in conjunction with the fork lift when lifting Claimant 15 feet into the air, and by Appellant's failure to give adequate warning of the dangers associated with using the fork lift without the guarded safety cage. *See Loyd,* 4 S.W.3d at 587. Point Three is denied.

The award of the Commission is affirmed in part and reversed in part, and the cause is remanded for proceedings not inconsistent with this opinion. *Akers,* 961 S.W.2d at 58.

PREWITT and GARRISON, JJ., concur.