**Larry D. CALVERT,
Claimant/Appellant,**

**v.**

**TREASURER OF the STATE OF Missouri, Custodian of Second Injury Fund, Respondent/Cross–Appellant.**

**Nos. SD 31751, SD 31807.**

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 27, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 16, 2013.

Application for Transfer Denied Feb. 4, 2014.

Michael Moroni, of Bloomfiled, MO, for Appellant.

Chris Koster, Attorney General and Jonathan J. Linter, Assistant Attorney General, of Cape Girardeau, MO, for Respondent.

WILLIAM W. FRANCIS, JR., J.

In this consolidated appeal, Larry D. Calvert ("Calvert") and the Second Injury Fund ("SIF") appeal from a final award of the Labor and Industrial Relations Commission ("Commission") in a workers' compensation claim. We affirm the Commission's award in part and reverse and remand in part.

## Factual and Procedural Background

Calvert, who was 59 years old at the time of hearing, was employed with Noranda Aluminum ("Noranda") for approximately 30 years and had performed numerous "heavy manual labor" jobs for Noranda throughout that time. Calvert had numerous pre-existing work-related injuries prior to the injury at issue here. In 1985 Calvert settled a workers' compensation claim for right knee surgery for 5% permanent partial disability; in 1988 he settled a workers' compensation claim for left knee surgery for 15% permanent partial disability; in 1991 he settled a workers' compensation case for back strain for 15% permanent partial disabili-

ty to the body as a whole; and in 1998 he settled a workers' compensation claim for neck fusion surgery for 22% permanent partial disability to the body as a whole. These prior injuries affected Calvert in that he continuously had a stiff neck, which impacted his ability to turn his head such that he had "a really hard time" driving; had regular headaches; had to take Xanax for muscle spasms; had "pain in [his] right elbow and numbness in [his] right hand at times"; had a weak grip; and continued to have lower back pain. At some point in time, Calvert also suffered an injury to his right thumb. After each of these injuries, Calvert returned to work for Noranda with no accommodations, although he was off work for 16 months beginning in approximately 1998 following his neck injury.

The primary injury in this matter occurred on July 12, 2003, when Calvert, who was working for Noranda as a "furnace operator[,]" got his jeans caught "on a piece of rebar" and "fell backwards" while trying to avoid a forklift being operated by a co-worker. He fell on his "rear-end and both [his] arms" including his elbows. After visiting first aid, Noranda sent him to the emergency room at a hospital in Sikeston, Missouri. Thereafter, he was treated by Dr. Kevin Vaught ("Dr. Vaught"), his personal physician; Dr. David G. Yingling ("Dr. Yingling"); Dr. David M. Brown; as well as other physicians. As a result of the fall, Calvert ultimately had surgery on his left elbow and hand, in addition to having injuries to his low back, neck, and right hand.[1] He also had ongoing issues

with pain and sought treatment for pain management consisting of physical therapy. Following the primary injury, Calvert also had problems with his left pinkie finger; suffered from "normal pains"; began having increasing trouble with his left elbow; had ongoing issues with carpal tunnel syndrome such that he had "carpal tunnel release" surgery performed on his right hand in October 2004; and he had numbness in his hands if he slept on his back.[2] As a result of this primary injury, Calvert could no longer hunt with a shotgun, fish from his canoe, play golf, ride his motorcycle, or swim. Further, he was unable to sit for long periods of time due to pain in his neck and back; the heaviest thing he could lift was a "case of soda"; took numerous pain medications on a regular basis; could no longer do his own housekeeping; took "two to three days" to mow his lawn with a riding lawnmower; had to lie down during the day several times a week; and used a TENS [3] unit and heating pads on his neck and back several times a week. Calvert supported himself by drawing social security disability in the amount of $1,848 per month, and "one-half [his] retirement" from Noranda totaling about $455 per month. Calvert did not return to work following the primary injury, and was eventually terminated by Noranda, although he would have preferred to continue working in some capacity.

Calvert filed his "Claim for Compensation" on October 15, 2003. A hearing was held on November 30, 2010. At the hearing, Calvert introduced the deposition testimony of Dr. Raymond Cohen ("Dr. Co-

---

1. While Calvert previously injured both his neck and back, the Administrative Law Judge specifically found Calvert injured his neck and back when he fell on July 12, 2003. Calvert was treated for pain management related to his back following this fall. No surgical intervention was suggested for his back and neck pain.

2. As a result of his surgeries, Calvert had a seven-inch scar on his left elbow, and a one-inch scar on his right wrist.

3. Abbreviation for "Transcutaneous Electrical Nerve Stimulation."

hen"), a neurologist, who evaluated Calvert on July 18, 2006. After reviewing various medical records provided by Calvert, as well as interviewing and examining him, Dr. Cohen reported Calvert disclosed the following prior medical issues: a 1999 neck surgery performed by Dr. Yingling, which caused subsequent "periods of muscle spasms and headaches" and required Calvert to change jobs within Noranda; an incident in 1991 where he had a "ruptured and protruded disc in his low back"; and surgeries in 1998 "for a left knee cartilage tear" and in 1986 for "a right knee cartilage tear." Upon physical examination, Dr. Cohen determined Calvert had weak arm strength, as well as grip strength, for someone of his age; the muscles in his lower extremities below the knees were weak; his "gait was somewhat slow with limp favoring the left leg[ ]"; he had knee "grinding" in the area of his kneecaps; diminished reflexes; "sensory loss to pain and temperature" on portions of his body; he was tender to palpitation on both elbows; and he had a limited range of motion in his various joints. Dr. Cohen concluded there was "a causal relationship" between Calvert's pre-existing conditions and the injury of July 2003, such that "within a reasonable degree of medical certainty" Calvert's post-injury ailments were a direct result of the accident and the pre-existing injuries were a substantial factor in the current state of his health.

Dr. Cohen determined Calvert had a "42 percent whole person disability at the level of the cervical spine, of which 22 percent is pre-existing, and 20 percent is from the primary work-related injury[ ]"; a "30 percent whole person disability at the level of the lumbar spine, of which 15 percent is pre-existing, and 15 percent is as a direct result of the primary work-related injury[ ]"; a "30 percent permanent partial disability at the left elbow[ ]"; and a "30 percent permanent partial disability at the right wrist[ ]"; with these last two disabilities being due to the primary work-related injury. Additionally, due to his prior injuries, Dr. Cohen determined Calvert had a "30 percent permanent partial disability at the left knee, and a 30 percent permanent partial disability at the right knee." Dr. Cohen concluded Calvert's combination of disabilities rendered Calvert permanently and totally disabled. It was also Dr. Cohen's opinion that Calvert's pre-existing and current disabilities "were a hindrance or obstacle to his employment or re-employment."

Calvert also introduced the deposition testimony of Susan Shea ("Shea"), a "Certified Rehabilitation Counselor," who performed an evaluation of Calvert on October 8, 2008. Shea concluded to "a reasonable degree of professional certainty" that Calvert was not "employable in the open labor market" and that "a normal and rational employer [would not] employ [Calvert] in a typical job in the open labor market[.]"

Calvert also offered the deposition testimony of Bret Derrick ("Derrick"), a physical therapist who performed a functional capacity evaluation on Calvert. Derrick reported that based on certain testing, he felt Calvert's physical issues relating to his back caused him to be severely disabled, and his issues relating to his neck caused him to be classified as "crippled." He related he performed a test on Calvert's hand in which the average score was typically in the 58th percentile while Calvert's left hand scored in the 12th percentile and his right hand scored in the 10th percentile. It was Derrick's opinion that Calvert "is able to function at the light/sedentary physical-demands classification[,]" but that if he could lift slightly more weight, as was reported in one of the other vocational reports, he would be classified in the medium physical-demands category.

Noranda presented the deposition testimony of Dr. James Coyle ("Dr. Coyle"), an orthopedic spine surgeon who evaluated Calvert on August 17, 2005. Dr. Coyle related Calvert complained of neck, back, and shoulder pain, as well as numbness in his right arm and lower extremities which Calvert believed began at the time of the primary injury. He noted that while he observed Calvert limping while in his office, he was able to see Calvert walking through the parking lot after the examination and at that time saw no noticeable limp. He related Calvert "declined" to perform most of the physical tests requested of him and "groaned" and performed slowly during the tests he did perform. Dr. Coyle related he saw signs of "symptom magnification" in his evaluation of Calvert; noted that " '[d]espite his claim that he's severely disabled over a two-year period, he had no evidence of muscle wasting or atrophy[ ]' "; and observed there were "inconsistencies in his movement." In reviewing Calvert's medical records, he noted the previous findings by the various physicians were normal and there was never any specific diagnosis for his various pains with the exception that Dr. Vaught indicated Calvert had "chronic cervical and low back pain." Dr. Coyle related a previously performed functional capacity evaluation stated Calvert did not give his best effort in that evaluation because his heart rate never became elevated and there was evidence of symptom magnification. Based on the fact that he "could see no credible injury mechanism to explain [Calvert's] claims of disability[,]" Dr. Coyle had lumbar and cervical "films" done on Calvert and the findings showed "a prior cervical fusion and some mild age-appropriate degenerative changes at C3–4 and C4–5." Dr. Coyle related that it was his "impression" that Calvert "did not sustain an injury with permanency when he fell[,]" and "with a reasonable degree of medical certainty," "there was some symptom magnification responsible for the subjective findings that [Calvert] was presenting with." Finding there was no "evidence of any permanent disability referable to that injury claim[,]" he felt Calvert should not remain on his current regimen of narcotic pharmaceuticals when there had never been an accurate diagnosis of his issues and there was no treatment actively being sought.

Noranda also presented the deposition testimony of James England ("England"), a rehabilitation counselor who evaluated Calvert on March 12, 2010. England testified he reviewed Calvert's medical records, performed some testing, and took a verbal history from Calvert. He related that his conclusions relating to Calvert's employability were based on the medical opinions he reviewed such that he believed Calvert could work in the light and sedentary levels. He explained Dr. Vaught's restrictions of lifting less than 20 pounds put Calvert in the light range while Dr. Cohen's determinations of Calvert's disability placed him in the sedentary level. He also explained that the narcotic pain medication Calvert takes would affect his employability depending on the job he was seeking. It was England's opinion that Calvert was employable in some capacity and that he was unemployable only if you considered Dr. Cohen's determinations that he was totally disabled.

Noranda also introduced medical records from a functional capacity evaluation performed on June 10, 2005, by Vic Zuccarello, a "therapist" employed by Mid America Rehab. This report stated:

Sub-maximal effort, subjective reports out of proportion with function/behavior. The above data should not be used to project current work capacity since it is likely he could perform at a higher level than what was observed today. Note

that within a few seconds his behavior changed from laughing and joking over the cell phone with his, 'banker,' to appearance of distress with evaluator.

[I]t was not possible to accurately identify his likely true abilities and limitations. The worker may indeed possess dysfunction, however inappropriate illness behavior was a limiting factor[.]

. . . .

It is the professional opinion of this therapist that he is employable on a full-time basis in a job **AT LEAST** the Light work demand level[.]

(Emphasis in original).

The Administrative Law Judge ("ALJ") entered a "Final Award" on March 7, 2011, and concluded Calvert was not permanently and totally disabled.[4] Instead, the ALJ awarded Calvert permanent partial disability benefits from SIF, as well as permanent partial disability and disfigurement benefits from Noranda.[5] Finding Dr. Cohen's opinion to be more credible than that of Dr. Coyle, the ALJ noted the pre-existing "disabilities constitute a hindrance or obstacle to employment and synergistically combine with the injuries from the accident of July 12, 2003[,] that also meet the threshold requirements to trigger [SIF] liability." The ALJ also awarded a "load of 10% be applied" for an award of $7,975.21 in permanent partial disability against SIF.

Calvert filed an "Application for Review" and a "Motion to Supplement Record" with the Commission. The Commission found the ALJ had erred in receipt of

certain exhibits, remanded the matter to the ALJ to correct the errors, and ruled that it would consider Calvert's Application for Review once the record was properly prepared and received. An "Amended Final Award" was filed on March 11, 2011. Once the complete record was received by the Commission, it reviewed the ALJ's findings, agreed that Calvert was not permanently and totally disabled, and then modified the award of permanent partial disability benefits awarded against SIF. The Commission determined Calvert should receive more permanent partial disability benefits from SIF. In calculating this amendment the Commission found, pursuant to section 287.220.1,[6] that Calvert "had more than a single pre[-]existing disability condition and the work injury resulted in more than one disabling condition, so the first threshold applies."

The Commission then found:

[W]e find appropriate and affirm the [ALJ]'s findings that employee suffered a 22% permanent partial disability of the body as a whole referable to his neck, 15% permanent partial disability of the body as a whole referable to his back, and 15% permanent partial disability of the left knee. In addition, based on the testimony from [Calvert] as well as the evidence of his prior workers' compensation settlements in connection with pre[-]existing right thumb and right knee conditions, we find that [Calvert] suffered a 15% permanent partial disability of his right thumb at the 60–week level, and a 5% permanent partial disability of his right knee.

---

4. The ALJ found the opinions of Dr. Coyle, Zuccarello, England, and even Derrick "more credible as to [Calvert]'s employability than the testimony and opinions of Dr. Cohen and [Shea]." The ALJ also noted Calvert "testified that his main disability is confined to his back and neck and involved pain. Despite substantial medical care and testing, despite the evaluations of multiple doctors, the consensus is

that no objective evidence can be found that supports the severity of [Calvert]'s claims."

5. This finding was not appealed by Noranda and, as such, we need not detail its specifics here.

6. All references to statutes are to RSMo 2000, unless otherwise indicated.

Converting [Calvert]'s pre[-]existing disabilities into weeks of compensation yields the following results: 88 weeks for the neck, 60 weeks for the back, 24 weeks for the left knee, 9 weeks for the right thumb, and 8 weeks for the right knee. The sum equals 189 weeks. [Calvert] has met the 50–week threshold.

The Commission concluded that Calvert's "pre[-]existing conditions amount to 189 weeks of permanent partial disability, and his primary injury resulted in 125.75 weeks of permanent partial disability. The sum of these two amounts is 314.75 weeks. When we multiply the sum by the 10% load factor, the result is 31.475 weeks."[7] As such, the Commission found SIF liable for 31.475 weeks of permanent partial disability benefits at the stipulated rate of compensation of $347.05 such that SIF owed Calvert $10,923.40 in permanent partial disability benefits.[8] The Commission otherwise adopted the findings of the ALJ.[9]

### General Standard of Review in Workers' Compensation Claims

As set forth in article V, section 18 of the Missouri Constitution, judicial review of the Commission's award is a determination of whether the award is "supported by competent and substantial evidence upon the whole record." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003) (internal quotation marks omitted).[10] Pursuant to section 287.495.1, this Court

shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award; [and]

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

§ 287.495.1; *Hampton*, 121 S.W.3d at 222. An award that is clearly "contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* at 223. This Court "must determine whether the Commission reasonably could have made its

---

7. In reaching this determination, the Commission, unlike the ALJ, specifically noted that "in connection with pre[-]existing right thumb and right knee conditions we find that [Calvert] suffered a 15% permanent partial disability of his right thumb at the 60–week level," such that when it converted the pre-existing thumb disability into weeks of compensation, it gave Calvert "9 weeks for the right thumb[.]" Further, it set a total of 8 weeks for "scarring" associated with the wrist surgeries following the primary injury—a finding that was likewise not made by the ALJ toward SIF. It also gave Calvert 5% permanent partial disability for injuries to the right knee at 8 weeks.

8. We note Commissioner Curtis Chick dissented in the Commission's opinion by concluding that Calvert was permanently and totally disabled.

9. Findings of the ALJ, adopted by the Commission and incorporated into the Commission's decision, are reviewed by the appellate court as the findings of the Commission. *Sell v. Ozarks Med. Ctr.*, 333 S.W.3d 498, 505 (Mo.App. S.D.2011).

10. We note several cases overruled by *Hampton* are cited in this opinion in support of other principles of law not affected by the *Hampton* ruling. *Hampton*, 121 S.W.3d at 224–32. No further acknowledgment of *Hampton's* effect on those cases needs to be recited hereafter.

findings and reached its result based upon all of the evidence before it." *Fitzwater v. Dept. of Public Safety,* 198 S.W.3d 623, 627 (Mo.App. W.D.2006). This Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony. *Sell v. Ozarks Med. Ctr.,* 333 S.W.3d 498, 506 (Mo.App. S.D.2011). While we defer to the Commission on issues of fact, we review questions of law *de novo. Id.*

### Calvert's Appeal (SD31751)

The issues presented for our determination from Calvert are:

1. Did the Commission err in excluding six of Calvert's exhibits in that "the regulation requiring the rules of evidence in civil cases be followed is invalid" due to its conflict with sections 287.460.1 and 287.550, as well as the Administrative Procedures Act?

2. Was the Commission's determination that Calvert was permanently partially disabled supported by competent and substantial evidence where there was expert testimony to the contrary?

### Point I: Exclusion of Exhibits Not Erroneous

#### Standard of Review

■ While we are aware of the overarching standard of review set out in section 287.495.1 recited above, we are also mindful that the Commission's decision on the admissibility "of evidence will not be overturned absent an abuse of discretion." *Garrett v. Treasurer of State of Missouri as Custodian for the Second Injury Fund,* 215 S.W.3d 244, 249 (Mo.App. S.D.2007); *see also Casteel v. General Council of Assemblies of God,* 257 S.W.3d 160, 162 (Mo. App. S.D.2008).

### Analysis

At the hearing before the ALJ, Calvert attempted to admit numerous exhibits into the record and SIF objected to the introduction of Exhibits M, N, P, Q, R and T, on the basis that those exhibits contained impermissible hearsay and lacked the necessary certifications required.[11] Calvert did not make an offer of proof as it related to those exhibits, the ALJ made no specific ruling on the admissibility of those exhibits, and the ALJ did not mention the exhibits at issue in the Final Award.

■ Thereafter, Calvert filed his Application for Review in which he raised the issue of the ALJ's "determination to exclude" the exhibits. While his review application was pending, Calvert filed an "Offer of Proof as to Exhibits M, N, P, Q, R and T" with the Commission in which he "pray[ed] ... [the] Commission accept the Records as an offer of proof." Upon rendering its "Final Award Allowing Compensation," the Commission did not refer to the exhibits at issue in finding Calvert was entitled to permanent partial disability benefits and not entitled to permanent total disability benefits.[12]

11. Exhibits M and N were records from Calvert's functional capacity evaluation and physical therapy sessions while he was a patient with Health Facilities Rehab Service in 1999–2000. Exhibit P contained records from Calvert's treatment in 1991 by Dr. Carl Huff for back issues, with Exhibit Q being records from Calvert's treatment in 1991 by Ferguson Medical Group relating to his prior workers' compensation claims. Exhibit R included prior records from an emergency room visit Calvert made to Lucy Lee Hospital for back problems in 1991, and Exhibit T contained the records of Calvert's treatment by Dr. Brown in 2005.

12. This Court assumes the absence of a reference to the exhibits in its Final Award Allowing Compensation was a *de facto* exclusion of those exhibits by the Commission. "The only

"The procedures relating to claims under the Workers' Compensation Law are set forth in 8 CSR 50–2.010 of the Code of State Regulations." *Johnson v. River Oaks Nursing Home*, 872 S.W.2d 664, 665 (Mo.App. S.D.1994). 8 CSR 50–2.010(14) specifically provides that although "[h]earings ... shall be simple, informal proceedings[,]" it is clear that "[t]he rules of evidence for civil cases in the state of Missouri shall apply." As such, Calvert's arguments that the rules of evidence do not apply in workers' compensation hearings and that the regulations are contrary to other portions of the laws of this state, are facially incorrect.

■ Applying the rules of evidence to this issue, leads to our conclusion that the ALJ did not abuse its discretion in excluding the exhibits because Calvert did not make an offer of proof relating to the exhibits. The lack of an offer of proof at the hearing fails to preserve this issue. *Calzaretta v. Willard*, 391 S.W.3d 488, 493 (Mo.App. S.D.2013). "Without an offer of proof, made on the record at trial, this Court cannot convict the trial court of error in failing to admit evidence[.]" *Id.* (internal quotations and citation omitted).

■ Calvert's attempt to make an offer of proof by filing an "Offer of Proof as to Exhibits M, N, P, Q, R and T" with the Commission fails to preserve the issue for appeal. "In order to present and preserve an offer of proof, the questions must be propounded to a witness who is present and has taken the stand. This enables the trial court to rule upon the propriety and admissibility of the evidence, and preserves a record for appellate review." *Id.* (internal quotations and citation omitted).

The Commission did not abuse its discretion in excluding Exhibits M, N, P, Q, R and T.[13] Calvert's Point I is denied.

### Point II: Competent and Substantial Evidence Supported Decision

#### Standard of Review

'Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record.' *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003). 'An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence.' *Id.* Thus, '[o]n a claim that

other reason for its silence would be that it simply forgot to reach this issue. We will not assume such a failure on the part of the Commission." *Stillwell v. Universal Const. Co.*, 922 S.W.2d 448, 458 n. 6 (Mo.App. W.D. 1996).

13. We also find no abuse of discretion in the Commission's decision not to admit Exhibits M, N, P, Q, R and T, because as found in Point II below, there was substantial and competent evidence to support the Commission's award such that any additional evidence which may have been found in the excluded exhibits was, at best, cumulative. The Commission was presented with evidence similar to Exhibits M and N (physical therapy notes and functional capacity evaluation) from the testimony and reports of therapists Derrick and Zuccarello; the testimony and

reports of Drs. Cohen and Coyle; and the testimony of Calvert, as well as other medical records in evidence. Additionally, Exhibits P, Q, and R contained medical records and notes relating to the treatment of Calvert's back in 1991 which is duplicative of Dr. Cohen and Dr. Coyle's hearing testimony regarding Calvert's prior history and their reports; and Calvert's testimony relating to his ongoing back issues. Likewise, Exhibit S, containing medical records from a neurologist dating from 1999 to 2005, and Exhibit T, containing notes from Dr. Brown, are merely duplicative of the medical expert testimony offered by Drs. Cohen and Coyle, the professional expert testimony offered by the various therapists and evaluators, the lay testimony offered by Calvert, and Calvert's medical records.

an award is against the weight of the evidence, we examine the evidence in the context of the whole record to determine whether it is supported by competent and substantial evidence.' *Fitzwater v. Dep't of Pub. Safety,* 198 S.W.3d 623, 627 (Mo.App. W.D.2006). Furthermore, on appeal, 'no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the [C]ommission within its powers shall be conclusive and binding.' Section 287.495.1. As such, 'we defer to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony.' *Pavia v. Smitty's Supermkt.,* 118 S.W.3d 228, 234 (Mo.App. S.D.2003).

*Sell v. Ozarks Med. Ctr.,* 333 S.W.3d at 505–06.

### Analysis

Noting again that this Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given their testimony, *Sell,* 333 S.W.3d at 506, we find there was competent and substantial evidence to support the Commission's determination that Calvert was permanently and partially disabled. Calvert's argument under this point relied on centers on his assertion that the Commission's "credibility determinations concerning the testimony and exhibits, especially Dr. Coyle and [England], were not supported [by] the competent and substantial evidence and were against the overwhelming weight of the evidence and were clearly wrong." Yet, "[s]uch arguments, in effect, invite us to violate our rules of review by substituting our view of . . . credibility for that of the Commission. We cannot and will not do so." *Dwyer v. Federal Exp. Corp.,* 353 S.W.3d 392, 395 (Mo.App. S.D.2011).

 Accordingly, on the issue of permanent total disability, the Commission found the testimony of Calvert, "supported by the expert opinions of Dr. Cohen and [Shea]" did not constitute "consistent and credible evidence" and that the testimony of Dr. Coyle, Zuccarello, England, and Derrick was "more credible as to [Calvert's] employability than the testimony and opinions of Dr. Cohen and [Shea]." "On the topic of permanent partial disability, [it found] parts of the opinions of Dr. Coyle and part of the opinions of Dr. Cohen [to be] credible[,]" but that "neither of the doctor's opinions [was] credible in all contexts." On the issue of SIF liability, the Commission found "the testimony of Dr. Cohen on the topics of hindrance and obstacle and synergism to be more credible than the opinion of Dr. Coyle." The opinions of the aforementioned experts, as well as Calvert himself, were introduced at the hearing without substantive objection and their admission is not challenged on appeal. Calvert's complaints regarding the experts' opinions are misplaced. Such complaints would appear to be a "back-door" attempt to object to evidence on appeal when no such objection was raised at the hearing. A party cannot raise an objection to the admissibility of expert opinions under guise of a sufficiency-of-evidence argument. *Lacy v. Federal Mogul,* 278 S.W.3d 691, 700 (Mo.App. S.D. 2009). SIF and Noranda offered expert testimony and other evidence that was contrary to that presented by Calvert; however, we defer to the Commission's choice between competing medical opinions and other conflicts in the evidence. *Proffer v. Federal Mogul Corp.,* 341 S.W.3d 184, 187 (Mo.App. S.D.2011); *Otte v. Langley's Lawn Care, Inc.,* 66 S.W.3d 64, 69 (Mo.App. E.D.2001). Based on our examination of the record, as well as our standard of review, there was competent and substantial evidence to support the Commission's determination that Calvert was entitled to permanent partial disability

benefits as opposed to permanent total disability benefits as he had requested. Calvert's second point is denied.

### SIF'S Appeal (SD31807)

These issues are presented by SIF's appeal:

1. Did the Commission err in considering Calvert's pre-existing disabilities of 15% to his right thumb, 5% to his right knee, 7.5% to his lumbar spine, 7.5% to his cervical spine, and findings of scarring in calculating SIF's liability under section 287.220.1?

2. Did the Commission err in awarding Calvert benefits for Calvert's pre-existing disabilities because the Commission did not make findings and "there is no evidence that the disabilities were a hindrance or obstacle to [Calvert's] employment or re-employment"?

3. Was there evidence of a synergistic effect between the pre-existing injuries to Calvert's thumb and scarring related to surgeries from the primary injury under section 287.220.1 such that the Commission could award Calvert benefits based in part on the combination of these disabilities?

### Point I: Consideration of Pre–Existing Disabilities Not Erroneous

### Standard of Review

SIF's Point I claims the Commission erred in

including Employee's pre-existing disability of 15% to his right thumb (9 weeks) and 5% to his right knee and disabilities of 7.5% to his lumbar spine (30 weeks), 7.5% to his cervical spine (30 weeks) and 8 weeks of scarring from the compensable injury, in calculating the liability of the [SIF] because none of these disabilities, or scarring, are to be considered in determining the liability of the [SIF] in that § 287.220.1 requires a disability to the body as a whole be at least 50 weeks, and a disability to a major extremity be at least 15% to qualify for [SIF] consideration, and weeks assessed for scarring are not included in the assessment of [SIF] liability at all per § 287.220.1.

Questions of law, such as those raised under this point relied on, are reviewed by this Court *de novo* and we do not defer to the findings of the Commission. *Sell*, 333 S.W.3d at 506.

### Analysis

SIF's complaint in Point I is that the Commission erred in including pre-existing disabilities that: (1) were not at least 50 weeks disability to the body as a whole; (2) at least 15% disability to a major extremity; and (3) weeks assessed for scarring in calculating the liability of SIF under section 287.220.1.[14] Basically, SIF's argument in this case is it was error in considering injuries that did not meet the statu-

---

14. Section 287.220.2 sets out the determination of SIF's liability for permanent partial disability benefits as follows:

If any employee who has a pre[-]existing permanent partial disability whether from compensable injury or otherwise, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining re[-]employment if the employee becomes unemployed, and the pre[-]existing perma-

nent partial disability, if a body as a whole injury, equals a minimum of fifty weeks of compensation or, if a major extremity injury only, equals a minimum of fifteen percent permanent partial disability, according to the medical standards that are used in determining such compensation, receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree or percentage of disability,

tory thresholds to calculate the extent of its liability. SIF recently made this same argument before the Supreme Court of Missouri in *Treasurer of the State of Missouri–Custodian of Second Injury Fund v. Witte*, 414 S.W.3d 455 (Mo.2013), and while this appeal was pending, the Supreme Court of Missouri decided *Witte* and rejected SIF's argument.

■ In *Witte*, SIF argued the Commission "misinterpreted and misapplied the law … by considering injuries that did not meet the statutory thresholds to calculate the extent of its liability." [15] *Witte*, 414 S.W.3d at 457. Like this case, in *Witte*, the Commission considered all of claimant's pre-existing permanent partial disabilities in calculating the amount of the award, and SIF claimed it was error to include "below-threshold pre[-]existing disabilities" in calculating an award. 414 S.W.3d at 467.

After the Supreme Court of Missouri determined SIF's liability was triggered by meeting the numerical threshold in the third sentence of section 287.220.1, the court reviewed the fourth sentence of section 287.220.1 because it "provides the mechanics for determining the amount of compensation for which [SIF] is liable." *Id.* *Witte* found, by looking at the plain and ordinary meaning of the statute's language, that

> [t]he statute directs the ALJ to determine the degree or percentage of dis-

---

in an amount equal to a minimum of fifty weeks compensation, if a body as a whole injury or, if a major extremity injury only, equals a minimum of fifteen percent permanent partial disability, caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, considered alone and of itself, and if the employee is entitled to receive compensation on the basis of the combined disabilities, the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no pre[-]existing disability. After the compensation liability of the employer for the last injury, considered alone, has been determined by an [ALJ] or the [Commission], the degree or percentage of employee's disability that is attributable to all injuries or conditions existing at the time the last injury was sustained shall then be determined by that [ALJ] or by the [Commission] and the degree or percentage of disability which existed prior to the last injury plus the disability resulting from the last injury, if any, considered alone, shall be deducted from the combined disability, and compensation for the balance, if any, shall be paid out of a special fund known as the second injury fund, hereinafter provided for.

15. In *Witte*, SIF also claimed error in "combining or 'stacking' injuries to meet the statutory thresholds in section 287.220.1 that trigger [SIF's] liability[.]" 414 S.W.3d at 457, 2013 WL 5989277, at *1. This claim is not made here. Rather, in this case, SIF's point relied on clearly claims the Commission erred in including the pre-existing conditions "in calculating the liability of [SIF]" because disabilities "to the body as a whole [must] be at least 50 weeks, and a disability to a major extremity [must] be at least 15% to qualify for [SIF] consideration."

Rule 84.04(e), which governs arguments in appellate briefs, expressly limits arguments "to those errors included in the 'Points Relied On.'" *See Osthus v. Countrylane Woods II Homeowners Ass'n*, 389 S.W.3d 712, 716 (Mo. App. E.D.2012) (holding "an appellant's brief also must contain an argument section that substantially follows each 'Point Relied On.'"). "Issues not encompassed by the point relied on and raised only in the argument portion of the brief are not preserved for review." *Cordes v. Williams*, 201 S.W.3d 122, 131 (Mo.App. W.D.2006) (internal quotation and citation omitted). *See also Hamilton v. Hamilton*, 340 S.W.3d 197, 201 (Mo.App. W.D.2011) (holding "[i]f a party fails to substantially comply with Rule 84.04, which requires the appellant to 'identify the trial court ruling or action that the appellant challenges,' then the argument is not preserved for appeal."). As such, we only review SIF's claim of error raised in the point relied on.

ability attributable to 'all injuries or conditions existing at the time the last injury was sustained.' Section 287.220.1. The plain and ordinary meaning of this language is that all pre[-]existing injuries, without the threshold limitation, are to be considered in calculating the amount of compensation. The legislature added a numerical threshold to the third sentence in section 287.220.1 for determining when the [SIF]'s liability is triggered. It could have added similar language to the fourth sentence to limit what can be used in computing a claimant's award, but it did not do so. Rather, it expressly requires all injuries or conditions existing at the time of the last injury to be considered.

414 S.W.3d at 467.

■ The *Witte* court concluded that once SIF's liability is triggered, "all pre[-]existing injuries must be considered in calculating the amount of compensation for which [SIF] is liable." *Id.* "We are constitutionally controlled by decisions of the Supreme Court of Missouri[ ]" and, therefore, are bound to follow *Witte* because it is the most recent decision of the Supreme· Court of Missouri on this issue. *State Farm Mut. Auto. Ins. Co. v. Zumwalt*, 825 S.W.2d 906, 909 (Mo.App. S.D. 1992).

■ Here, the Commission found Calvert suffered a 22% permanent partial disability of the body as a whole referable to his neck, 15% referable to his back, and 15% referable to his knee. The disability due to his neck injury entitled Calvert to 88 weeks of compensation.[16] Therefore, Calvert's disability to his body as a whole,

referable to his neck, meets the 50–week threshold to trigger SIF"s liability. *See Witte*, 414 S.W.3d at 468.

In light of the holding in *Witte*, since SIF's liability was triggered, *all* of Calvert's "injuries or conditions existing at the time the last injury was sustained[ ]" must then be considered in determining the extent of SIF's liability. 414 S.W.3d at 467.

Accordingly, we find the Commission did not err in considering Calvert's pre-existing disabilities of 15% to his right thumb, 5% to his right knee, 7.5% to his lumbar spine, and 7.5% to his cervical spine.[17] SIF"s Point I is denied.

### Point II: Inference of Disabilities Being a Hindrance or Obstacle to Employment Permitted

#### Standard of Review

■ "When the Commission affirms or adopts the findings of an ALJ (as it has done here), we review the decision and findings of the ALJ as adopted by the Commission." *Gassen v. Lienbengood*, 134 S.W.3d 75, 79 (Mo.App. W.D.2004). We defer to the Commission's factual findings and witness credibility determinations as we recognize "that it is the Commission's function to determine credibility of witnesses." *Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc 2012).

#### Analysis

SIF claims in Point II that the Commission erred in calculating its award because there was no evidence that "the disabilities considered in its calculation of [SIF] liability were a hindrance or obstacle to [Cal-

16. Calvert's disability due to his back entitled him to 60 weeks of compensation; this disability individually also met the 50–week threshold to trigger SIF's liability. *See Witte*, 414 S.W.3d at 468, 469.

17. *See* this Court's findings in Points II and III as to other disabilities included in SIF's liability.

vert's] employment or re-employment" and in failing to make a finding "regarding the affect upon [Calvert's] employability the disabilities had[.]"

Despite SIF's claim, there was a finding that Calvert's pre-existing disabilities were a hindrance or obstacle to his employment. The Commission specifically incorporated the ALJ's findings, conclusions, and amended award to the extent they were not inconsistent with the Commission's findings and award. The ALJ's award *specifically* found Calvert's pre-existing injuries constituted a hindrance or obstacle to employment.

Furthermore, the ALJ *specifically* found the testimony of Dr. Cohen on the issue of "hindrance and obstacle" to be credible. This finding by the ALJ, incorporated by the Commission, constitutes a finding that the pre-existing disabilities were a hindrance or obstacle. *See Witte,* 414 S.W.3d at 469 (holding "the [C]ommission made a finding that the [disability] constituted a hindrance or obstacle to employment when it expressly credited testimony from [doctor] that [the disabilities] amounted to a hindrance or obstacle.").

The finding on "hindrance or obstacle" was based on evidence showing the same, refuting SIF's claim that there was no evidence that the disabilities were a hindrance or obstacle. Dr. Cohen reviewed Calvert's medical records, and interviewed and examined Calvert. He testified Calvert's pre-existing injuries caused subsequent "periods of muscle spasms and headaches"; caused him to be unable to lift, bend, or squat without pain; and caused "difficulty squatting and kneeling." Upon physical examination, Dr. Cohen determined Calvert had weak arm strength, grip strength and muscles in his lower extremities below the knees; his "gait was somewhat slow with limp favoring the left leg[ ]"; had knee "grinding" in the area of

his kneecaps; diminished reflexes; "sensory loss to pain and temperature" on portions of his body; was tender to palpitation on both elbows; and had a limited range of motion in his various joints.

Dr. Cohen testified Calvert's pre-existing injuries or disabilities "combine, or have a synergistic effect to create a greater overall disability than their simple sum[ ]" such that "due to this combination of disabilities, ... they render [Calvert] permanently and totally disabled." Dr. Cohen related Calvert needed to be restricted from work that required standing for long periods of time; any activities involving "sitting, bending, stooping, lifting, twisting, squatting, kneeling, crawling, climbing, ladder work, or walking on uneven surfaces[ ]"; and he should not lift in excess of ten pounds. Based on these restrictions, it was Dr. Cohen's opinion that Calvert's pre-existing and current disabilities "were a hindrance or obstacle to his employment or re-employment."

We find the Commission did not err in awarding Calvert benefits for Calvert's disabilities because the Commission expressly found the pre-existing disabilities amounted to a hindrance or obstacle to employment and this finding is supported by testimony in the record. SIF's Point II is denied.

### *Point III: Evidence Insufficient Relating to Award for Thumb Injury and Scarring*

#### Standard of Review

We refer to our earlier review of the "General Standard of Review in Workers' Compensation Claims" and "Calvert's Appeal" Point II "Standard of Review."

#### Analysis

 SIF also argues the Commission erred in awarding benefits to Calvert, in-

cluding the pre-existing disability to his thumb and scarring, and scarring from the surgery necessitated by the work-related injury. SIF argues there is no evidence of a "synergistic effect" between the thumb, scarring from the compensable injury, and the compensable disability. In response, Calvert argues "[t]here was sufficient evidence in the record for the Commission to arrive at its decision . . . that there was a synergistic effect between the primary injuries including scarring and the pre[-]existing injuries."

The only evidence both parties point this Court to is testimony from Calvert's medical expert Dr. Cohen. SIF argues Dr. Cohen "did not rate or address a synergistic effect of [Calvert's] thumb injury or scarring from the compensable injury[ ]" and, therefore, the ALJ and the Commission did not make such a finding. *See Witte*, 414 S.W.3d at 469 (holding "the [C]ommission made a finding that the [disability] constituted a hindrance or obstacle to employment when it expressly credited testimony from [doctor] that [the disabilities] amounted to a hindrance or obstacle."). Calvert, in response, cites Dr. Cohen's medical rating, which was admitted as Exhibit 2, and included the following statement: "his pre-existing conditions or disabilities combine with the primary work-related injury to create a greater overall disability than their simple sum and that due to the combination of disabilities, they create a greater overall disability and a synergistic effect[.]"

We note Dr. Cohen did *not* include Calvert's thumb injury or any scarring in his list of Calvert's five pre-existing conditions or disabilities in Exhibit 2.[18] As to the scarring, Calvert simply lists Dr. Cohen's ratings for the left elbow and wrist; however, there is no evidence that Dr. Cohen's ratings establish a "synergistic effect." There is nothing before this Court of *any* evidence in the transcript or record of a "synergistic effect" between the thumb, scarring, and the compensable or primary injury.

The record presented to this Court indicates there was no evidence before the Commission of a synergistic effect between the pre-existing injuries to Calvert's thumb, scarring, and the compensable or primary injury. The Commission therefore erred in awarding Calvert benefits based in part on the combination of these disabilities, and in considering findings of scarring in calculating SIF's liability. SIF's Point III is granted.

### Conclusion

In light of our findings above, this matter is remanded to the Commission to recalculate the benefits due Calvert from SIF to exclude the pre-existing disability to Calvert's thumb and any scarring. The remaining portion of the Commission's award is affirmed.

GARY W. LYNCH, P.J. and NANCY STEFFEN RAHMEYER, J., concur.

---

**18.** The list of Calvert's "**PRE-EXISTING CONDITIONS OR DISABILITIES**" included:

1. Status-post cervical fusion at C5–6 for right herniated nucleus pulposus.
2. Status-post left knee surgery for internal derangement.
3. Status-post right knee surgery for internal derangement.
4. Cervical degenerative spine disease.
5. Lumbar degenerative spine disease.